SEIBLY *v.* CITY OF EATON RAPIDS.

HIGHWAYS AND STREETS—DEFECTS IN HIGHWAY—PROXIMATE CAUSE—EVIDENCE.

> Judgment for plaintiff motorist against defendant city is affirmed, where there is evidence that defect in State trunkline highway, made by defendant's employees in thawing underground water main which passed beneath the highway, was a prox'mate cause of plaintiff's injuries which he sustained at approximately 7:30 p.m. in mid-February as a result of crossing the unprotected, gravel-filled trench as to which no warning lights had been placed, there being no question of contributory negligence on the part of plaintiff (CLS 1956, § 242.1).

Appeal from Eaton; McDonald (Archie D.), J. Submitted October 4, 1962. (Docket No. 23, Calendar No. 49,436.) Decided December 3, 1962.

Case by Richard A. Seibly against the City of Eaton Rapids, a municipal corporation, for personal injuries sustained when his automobile struck a road defect. Judgment for plaintiff. Defendant appeals. Affirmed.

*Glassen, Parr, Rhead & McLean,* for plaintiff.

*McAuliffe & Harbert (J. W. McAuliffe,* of counsel), for defendant.

BLACK, J. This is a suit for negligence. Plaintiff alleges that the defendant city neglected to

---

REFERENCES FOR POINTS IN HEADNOTE

.25 Am Jur, Highways §§ 410, 411.

keep 1 of its principal thoroughfares in reasonable repair within meaning and purpose of CLS 1956, § 242.1 (Stat Ann 1958 Rev § 9.591), and, on account thereof, that he suffered permanently severe injuries. Trial to the court without a jury resulted in a substantial judgment for plaintiff. The city appeals.

Highway M-50 is the main blacktopped highway leading from Charlotte to Eaton Rapids. At the point of current interest it extends straight east into Eaton Rapids. In the fall of 1958 a new school was in the course of construction on the north side of the highway, near the west city limit. To provide water service for the school the city's nearest water main was extended—west some distance—along the south side of the highway to a point just short of such city limit. At that point the city water department cut a trench, north across the highway, for installation of a lateral pipe extending to the new school. The entire installation was completed at the time with filling and tamping of the trenches and blacktopping of the highway surface over the lateral trench.

February 19, 1959, the city water department received a service call, advising that water service to the school had failed. Suspecting a freeze-up, either of the extended main or the lateral pipe, the department opened up, one after the other for thawing purposes, 3 sections of the original excavation. Two of the openings exposed the new main along the south side of the highway. The third, with which we are concerned, was done over the lateral. It extended from the south side of the pavement to or near the center line of the highway.

The work of locating and thawing the suspected freeze-up progressed slowly.* Extremely cold

---

* Each day the crew would re-excavate one or more of the openings, work at thawing, and then refill pending the next work day.

weather prevented the doing of work for at least 1 day (the 23d). On the 24th, a Tuesday, the departmental employees succeeded in locating and thawing out the frozen portion, which turned out to be in that part of the lateral which was exposed by the third excavation.

The thawing job was accomplished by means of hoses connected with a nearby fire hydrant. When the ice finally gave way, quantities of water gushed out and flooded the pavement surface, some getting "into the entrance to the school." The pipe was finally "capped" and the excavation filled. The job was finished about 4:30 in the afternoon, some 3 hours or more prior to the approximate time plaintiff's pickup truck crossed the place of excavation and then veered off the road.

Byron Fowler, the city's assistant foreman in charge of the work of excavating, thawing and filling, testified as follows:

"*Q.* What material did you use to fill the hole?
"*A.* Gravel.
"*Q.* Was that the gravel that had been taken out of the hole, or new gravel?
"*A.* It was new gravel.
"*Q.* Did you find some in the hole that had not been frozen?
"*A.* Yes, sir.
"*Q.* Was that the lowest part?
"*A.* Yes, sir.
"*Q.* You put that back?
"*A.* Yes, sir.
"*Q.* Otherwise, you used fresh gravel?
"*A.* Yes, sir.
"*Q.* How high did you fill it?
"*A.* Approximately 2-1/2—2-1/2 to 3 inches above the blacktop.
"*Q.* What did you use to pack it?
"*A.* Front end loader.

"*Q.* Is that a shovel-type apparatus located on the front of a tractor?

"*A.* Yes, sir.

"*Q.* How would you pack it, by driving over it back and forth?

"*A.* Yes, sir.

"*Q.* Did you use any tamping in the process of filling?

"*A.* Well, in the bottom part of a hole, yes.

"*Q.* In the process of using this loader, would you drive it over and pack it down, and then put more in?

"*A.* Yes, sir.

"*Q.* And, you continued that process?

"*A.* Yes, sir. Until we had it solid.

"*Q.* Until you had it solid on the mound, that would make it 2-1/2 to 3 inches above the blacktop?

"*A.* Yes, sir.

"*Q.* After you completed that, did you leave the job?

"*A.* Yes, sir."

About 5 in the afternoon of the day of the accident Arthur Colestock, a city patrolman, was instructed by 1 of the city commissioners "to keep a good watch of the road out there, to see that it didn't settle." Mr. Colestock accordingly went to the place of excavation at about 6 o'clock and again around 7 o'clock. According to his testimony everything was in satisfactory condition.* The third time Mr. Colestock arrived was shortly after plaintiff's accident had been reported. The report was made about 8 o'clock, by witness Reitz.

Plaintiff's accident occurred some time after 7 and before 8 o'clock in the evening. The exact time is unknown since plaintiff's injuries were so severe as

---

* Mr. Colestock made a report at the time. It is quoted as follows in the defendant-appellant's appendix:

"I checked at 6:15 and again at 7:00. Since it was not settled, I did not order barricades or lights placed there."

to leave him unconscious, disturbed mentally, and suffering from what the declaration refers to as cerebral atrophy. With respect to the accident he could remember only "something like a hole in the road"; that he "stepped down easy on my footbrake," and that he felt "an awful jar inside the pickup and a bad jerk on the wheel—the steering wheel." He was found by 2 passing motorists (witnesses Reitz and Hillard), slumped over in his truck, at a point where the truck had angled—at about 45 degrees—from the place of excavation head-on into a tree. The tree was in the north highway ditch.

The sole question is whether the trial judge's ruling, that the city became liable to plaintiff under the cited statute, is contrary to the clear preponderance of the evidence. For the plaintiff considerable testimony, apparently believed by the trial judge, tended to show that the excavated portion had settled some 6 inches; also that a number of other motorists had struck the "bump" between the first time of opening of the pavement excavation and the final denouement, with variable descriptions of the depth of the "bump" and the effects of striking it; whereas the city's proof, coming principally from employees of the city, tended to show that the depression, if any, was negligible; "an inch and a half or 2; a bump." An example of the latter is Mr. Colestock's testimony:

"*Q.* And, you came to the conclusion it was some 1-1/2 to 3 inches deep?

"*A.* Sort of a wave in the road. (Indicating wave with hand.) It had packed down.

"*Q.* It wasn't exactly even?

"*A.* No, it was not.

"*Q.* And, it was a different surface on this, than it was on the blacktop, of course?

"*A.* Yes.

"*Q.* And, it was fairly soft, so a car would punch it down a little bit as they came through there?

"*A.* Yes."

Mr. Reitz, previously mentioned, approached the place of excavation from the same direction as had plaintiff a short time before; that is, from the west. Mr. Reitz, referring to the approach of his car to the scene, testified:

"*A.* Howard [his passenger, witness Hillard] and I were talking back and forth, and we—Well, I did not notice any patched place in the road until we'd passed over it. And, it caused my car to shimmy—the front wheels to shimmy back and forth. It was enough to startle me to grab the wheel tighter, but it wasn't too fierce.

"*Q.* You say this patched place in the road caused your wheels to shimmy back and forth, enough to startle you?

"*A.* Yes.

"*Q.* And, you were driving about 35 miles per hour?

"*A.* Yes."

Mr. Hillard testified:

"*Q.* Now, you've hit bumps in the road before, haven't you?

"*A.* Yes, sir.

"*Q.* Was this sharper, than the ordinary bump you find, driving along the ordinary blacktop road?

"*A.* It was a sharper bump.

"*Q.* Sharper bump?

"*A.* Yes, sir.

"*Q.* Would you state whether it was of sufficient force and violence to cause the vehicle to make a noise?

"*A.* No, sir.

"*Q.* I mean a clunk.

"*A.* You mean the shocks and springs?

"*Q.* Yes, sir.

"*A.* I believe so.

"*Q.* You think so. Do you form any idea, how deep this hole in the road was?

"*A.* No, sir."

Immediately after the Reitz car struck the "bump" or "hole," Mr. Hillard discovered plaintiff's wrecked truck against the tree across the highway. Mr. Reitz stopped his car and the 2 investigated. An ambulance was called and Mr. Colestock was informed that way.

The next event was the sending of a city truck, upon Patrolman Colestock's call, with gravel for filling or mounding the place of highway excavation. The city truck driver testified that only a few shovelfuls of gravel were needed for such filling or mounding, there being no real depression, and that he took just about all of the gravel back with him on the return trip. Shortly thereafter, by flash photography, a picture (exhibit 2) was taken of the freshly made mound. No picture of the same scene was taken prior to such mounding. In the morning the mound or surface fill was removed by city employees, at which time they proceeded to level and blacktop the original trench cut.

Views of this case from all corners of the record point up several undisputed facts. One is that the ground was frozen to water main depth when the pavement was cut and excavated. Cold weather continued. The trench and pavement were flooded with water before filling of the trench, a few hours only prior to plaintiff's accident. The city commissioner understandably was concerned about settling of the fill. The city did not barricade—with lights—the south half of the pavement. The plaintiff's pickup truck crossed the filled excavation and then, without equiponderant inference of some other causative factor (see *Kaminski* v. *Grand Trunk W. R. Co.,* 347 Mich 417), veered sharply off the highway into the

tree. In such latter connection it was shown that Mr. Colestock checked carefully for evidence that plaintiff had been drinking intoxicants, and found none. Further, there is no proof of excessive or unreasonable speed of approach to the place of excavation and fill, by the plaintiff motorist.

It is permissibly inferable that the defendant city's employees, on that final day of thawing and filling, repeated the practice pursued each previous. day without taking into account a possibly new factor of settlement causation, a factor of their own making. They probably assumed that the filling job would not, as seemingly was the case each previous day, settle too much before the next morning. That last day, however, the trench and pavement were flooded with water, and water at any temperature above freezing has its effect, especially when covered, on adjacent frozen earth. All in all the proof would justify conclusion by any trier or triers of fact that the city should have barricaded the south half of the pavement with lights of due warning, or should have provided some other equally effective means of protecting the motoring public from injury, and that failure of such preventive means was causally connected with plaintiff's injuries. That is sufficient to call for affirmance, there being no question of contributory negligence.

It is so ordered. Costs to plaintiff.

Carr, C. J., and Dethmers, Kelly, Kavanagh, Souris, Otis M. Smith, and Adams, JJ., concurred.